# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| TROY UPSHAW, | Case No.: 1:18-cv-00407-REB |
| Petitioner, | **MEMORANDUM DECISION AND ORDER** |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Respondent, | |

Before the Court is Petitioner Troy Upshaw's Petition for Review (Dkt. 1), seeking review of the Social Security Administration's denial of his application for Social Security Disability Benefits for lack of disability.  This action is brought pursuant to 42 U.S.C. § 405(g).  Having carefully considered the record and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I.  ADMINISTRATIVE PROCEEDINGS

On September 8, 2015, Troy Upshaw ("Petitioner") protectively filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning February 1, 2015.  This claim was initially denied on January 6, 2016 and, again, on reconsideration on March 15, 2016.  On March 21, 2016, Petitioner filed a Request for Hearing before an Administrative Law Judge ("ALJ").  On August 25, 2017, ALJ Russell B. Wolff held a hearing in Boise, Idaho, at which time Petitioner, represented by attorney Barbara Harper, appeared and testified.  Theresa Upshaw, Petitioner's wife, and Jerry Gravatt, an impartial vocational expert, also appeared and testified at the same hearing.

On November 13, 2017, the ALJ issued a Decision denying Petitioner's claim, finding that he was not disabled within the meaning of the Social Security Act.  Petitioner timely

**MEMORANDUM DECISION AND ORDER - 1**

requested review from the Appeals Council and, on August 24, 2018, the Appeals Council denied Petitioner's Request for Review, making the ALJ's Decision the final decision of the Commissioner of Social Security.

Having exhausted his administrative remedies, Petitioner filed the instant action on September 19, 2018, arguing that he ALJ's disability determination "is not in accordance with the purpose and intent of the Social Security Act, nor is it in accordance with the law, nor is it in accordance with the evidence, but contrary thereto and to the facts and against the evidence, in that Petitioner is disabled from performing substantial gainful activity." Pet. for Review, p. 2 (Dkt. 1). Specifically, Petitioner submits that the ALJ's Decision was not supported by substantial evidence, nor was it based upon the correct legal standard in the following respects: (1) the ALJ erred at step three of the sequential process when he determined that Petitioner's mental health limitations did not meet or equal a listed impairment; (2) the ALJ erred when he improperly dismissed Petitioner's allegations of pain and other symptoms as inconsistent with the medical evidence of record; (3) the ALJ erred when he dismissed the testimony of lay persons without providing germane reasons; and (4) the ALJ erred when he assigned Petitioner a residual functional capacity that was not supported by substantial evidence. *See* Pet.'s Brief, p. 6 (Dkt. 15). Petitioner therefore requests that the Court either reverse the ALJ's Decision and find that he is entitled to disability benefits or, alternatively, remand the case for further proceedings. *See id.* at pp. 19-20; *see also* Pet. for Review, p. 2 (Dkt. 1).

## II.  STANDARD OF REVIEW

To be upheld, the Commissioner's decision must be supported by substantial evidence and based on proper legal standards. *See* 42 U.S.C. § 405(g); *Matney ex. rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992); *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990). Findings as to any question of fact, if supported by substantial evidence, are conclusive. *See* 42

**MEMORANDUM DECISION AND ORDER - 2**

U.S.C. § 405(g).  In other words, if there is substantial evidence to support the ALJ's factual

decisions, they must be upheld, even when there is conflicting evidence.  *See Hall v. Sec'y of*

*Health, Educ. & Welfare*, 602 F.2d 1372, 1374 (9th Cir. 1979).

"Substantial evidence" is defined as such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.  *See Richardson v. Perales*, 402 U.S. 389, 401

(1971); *Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1993).  The standard is fluid and

nuanced, requiring more than a scintilla but less than a preponderance (*see Sorenson v.*

*Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975); *Magallanes v. Bowen*, 881 F.2d 747, 750

(9th Cir. 1989)), and "does not mean a large or considerable amount of evidence."  *Pierce v.*

*Underwood*, 487 U.S. 552, 565 (1988).

With respect to questions of fact, the role of the Court is to review the entire record  to

determine whether it contains evidence that would allow a reasonable mind to accept the

conclusions of the ALJ.  *See Richardson*, 402 U.S. at 401; *see also Matney*, 981 F.2d at 1019.

The ALJ is responsible for determining credibility and resolving conflicts in medical testimony

(*see Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)), resolving ambiguities (*see Vincent ex.*

*rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984)), and drawing inferences

logically flowing from the evidence (*see Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir.

1982)).  Where the evidence is susceptible to more than one rational interpretation, the reviewing

court may not substitute its judgment or interpretation of the record for that of the ALJ.  *See*

*Flaten*, 44 F.3d at 1457; *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

With respect to questions of law, the ALJ's decision must be based on proper legal

standards and will be reversed or remanded for legal error.  *See Matney*, 981 F.2d at 1019.  The

ALJ's construction of the Social Security Act is entitled to deference if it has a reasonable basis

in law.  *See id.*  However, to be clear, reviewing federal courts "will not rubber-stamp an

**MEMORANDUM DECISION AND ORDER - 3**

administrative decision that is inconsistent with the statutory mandate or that frustrates the congressional purpose underlying the statute." *See Smith v. Heckler*, 820 F.2d 1093, 1094 (9th Cir. 1987).

### III. <u>DISCUSSION</u>

#### A.    **Sequential Process**

In evaluating the evidence presented at an administrative hearing, the ALJ must follow a sequential process in determining whether a person is disabled in general (*see* 20 C.F.R. §§ 404.1520, 416.920) – or continues to be disabled (*see* 20 C.F.R. §§ 404.1594, 416.994) – within the meaning of the Social Security Act.

The first step requires the ALJ to determine whether the claimant is engaged in substantial gainful activity ("SGA"). *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). SGA is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities. *See* 20 C.F.R. §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized. *See* 20 C.F.R. §§ 404.1572(b), 416.972(b). If the claimant has engaged in SGA, disability benefits are denied, regardless of how severe his physical/mental impairments are and regardless of his age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not engaged in SGA, the analysis proceeds to the second step. Here, the ALJ found that Petitioner "has not engaged in substantial gainful activity since February 1, 2015, the alleged onset date." (AR 12).

The second step requires the ALJ to determine whether the claimant has a medically determinable impairment, or combination of impairments, that is severe and meets the duration requirement. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment or combination of impairments is "severe" within the meaning of the Social Security Act if it

**MEMORANDUM DECISION AND ORDER - 4**

significantly limits an individual's ability to perform basic work activities.  20 C.F.R.

§§ 404.1520(c), 416.920(c).  An impairment or combination of impairments is "not severe"

when medical and other evidence establish only a slight abnormality or a combination of slight

abnormalities that would have no more than a minimal effect on an individual's ability to work.

*See* 20 C.F.R. §§ 404.1521, 416.921.  If the claimant does not have a severe medically

determinable impairment or combination of impairments, disability benefits are denied.  *See* 20

C.F.R. §§ 404.1520(c), 416.920(c).  Here, the ALJ found that Petitioner has the following

medically determinable impairments:  "vertigo, diabetes, obesity, depression, and cognitive

disorder."  (AR 12).

The third step requires the ALJ to determine the medical severity of any impairments;

that is, whether the claimant's impairments meet or equal a listed impairment under 20 C.F.R.

Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the

answer is yes, the claimant is considered disabled under the Social Security Act and benefits are

awarded.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant's impairments neither meet

nor equal one of the listed impairments, the claimant's case cannot be resolved at step three and

the evaluation proceeds to step four.  *See id.*  Here, the ALJ concluded that Petitioner's above-

listed impairments, while severe, do not meet or medically equal, either singly or in combination,

the criteria established for any of the qualifying impairments.  *See* (AR 13-16).

The fourth step of the evaluation process requires the ALJ to determine whether the

claimant's residual functional capacity ("RFC") is sufficient for the claimant to perform past

relevant work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  An individual's RFC is

his ability to do physical and mental work activities on a sustained basis despite limitations from

his impairments.  *See* 20 C.F.R. §§ 404.1545, 416.945.  Likewise, an individual's past relevant

work is work performed within the last 15 years or 15 years prior to the date that disability must

**MEMORANDUM DECISION AND ORDER - 5**

be established; also, the work must have lasted long enough for the claimant to learn to do the

job and be engaged in substantial gainful activity.  *See* 20 C.F.R. §§ 404.1560(b), 404.1565,

416.960(b), 416.965.  On this point, the ALJ concluded:

> After careful consideration of the entire record, I find that the claimant has the
> residual functional capacity to perform medium work as defined in 20 CFR
> 404.1567(c) except that the claimant can occasionally balance and climb ramps and
> stairs, but can never climb ropes, ladders, or scaffolds.  The claimant can frequently
> handle and finger with the bilateral upper extremities.  The claimant can never work
> at unprotected heights or around moving mechanical parts.  The claimant is limited
> to performing simple, routine or repetitive tasks and following simple work related
> instructions.  The claimant is limited to simple work related decisions.  The
> claimant can occasionally interact with the public.

(AR 16).

In the fifth and final step, if it has been established that a claimant can no longer perform

past relevant work because of his impairments, the burden shifts to the Commissioner to show

that the claimant retains the ability to do alternate work and to demonstrate that such alternate

work exists in significant numbers in the national economy.  *See* 20 C.F.R. §§ 404.1520(a)(4)(v),

416.920(a)(4)(v), 404.1520(f), 416.920(f); *see also Matthews v. Shalala*, 10 F.3d 678, 681 (9th

Cir. 1993).  Here, the ALJ found that Petitioner "is capable of performing past relevant work as a

warehouse worker" as "[t]his work does not require the performance of work-related activities

precluded by the claimant's residual functional capacity."  (AR 22).  Alternatively, considering

Petitioner's age, education, work experience, and RFC, the ALJ separately concluded that

Petitioner "is capable of making a successful adjustment to other work that exists in significant

numbers in the national economy, including (1) cleaner, industrial/hospital, (2) general laborer,

and (3) polisher/buffer.  *See* (AR 22-23).  Therefore, the ALJ concluded that Petitioner "has not

been under a disability, as defined in the Social Security Act, from February 1, 2015, through the

date of this decision."  (AR 24) ("A finding of 'not disabled' is therefore appropriate under the

framework of the above-cited rules.").

**MEMORANDUM DECISION AND ORDER - 6**

**B.      Analysis**

Petitioner contends that the ALJ erred by (1) failing to conclude at the third step of the sequential process that he is presumptively disabled, owing to his mental health impairments; (2) improperly contesting his credibility; (3) dismissing his wife's testimony; and (4) assigning him an RFC not supported by substantial evidence.  *See* Pet.'s Brief, pp. 6-19 (Dkt. 15).  Each issue is addressed below.

      1.      <u>The ALJ Did Not Err in Evaluating the Severity of Petitioner's Mental Health Impairments at Step Three of the Sequential Process</u>

As discussed above, an ALJ must evaluate a claimant's impairments to see if they meet or equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. § 404.1520(d); *see also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  An impairment meets a listed impairment "only when it manifests the specific findings described in the set of medical criteria for that impairment."  *See* SSR 83-19; *see also* 20 C.F.R. § 404.1525; *Tackett*, 190 F.3d at 1099 (impairment meets or equals listed impairment only if medical findings (defined as set of symptoms, signs, and laboratory findings) are at least equivalent in severity to set of medical findings for listed impairment).  Though a claimant's burden to establish, "[a]n ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment.  A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so."  *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001).  However, the ALJ is not required to state why a claimant fails to satisfy every criteria of the Listing if they adequately summarize and evaluate the evidence.  *See Gonzalez*, 914 F.2d at 1200-01; *Lewis*, 236 F.3d at 512.

Here, the ALJ considered whether Petitioner's mental impairments met or equaled the criteria for Listings 12.02 (neurocognitive disorders) or 12.04 (depressive disorders).  *See* (AR

13-16).  These conditions are not deemed disabling unless the functional limitations knowns as "Paragraph B criteria" are present, meaning a claimant has one extreme or two marked functional limitations in his ability to:  (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *See* 20 C.F.R. § 404, Subpt. P, App. 1 § 12.00E.[1]  An extreme limitation is characterized by an individual's inability to function in the respective area independently, appropriately, and effectively on a sustained basis; a marked limitation means that the claimant's ability to independently, appropriately, and effectively function in a particular area on a sustained basis is seriously limited.  *See* 20 C.F.R. § 404, Subpt. P, App. 1 §§ 12.00(F)(2)(e)-(d).

With this backdrop, the ALJ found that Petitioner was markedly limited in the area of concentrating, persisting, or maintaining pace, and only moderately limited in all of the other above-referenced areas.  *See* (AR 14-15).  Therefore, because Petitioner's mental impairments did not cause at least two marked limitations or one extreme limitation, the Paragraph B criteria were not satisfied and, accordingly, Petitioner's mental impairments did not meet or equal a listed impairment.  *See id*.  Petitioner argues this was improper, claiming that his limitations were marked (rather than only moderate) in the areas of (1) understanding, remembering, or applying information, and (2) interacting with others.  *See* Pet.'s Brief, pp. 8-11 (Dkt. 15).[2]  According to

---

[1]  These criteria became effective January 17, 2017, and apply to claims that were pending at that time.  *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01 (available at 2016 WL 5341732) ("When the final rules become effective, we will apply them to new applications filed on or after the effective date of the rules, and to claims that are pending on or after the effective date.").

[2]  This means that, for the purposes of this action, there is no dispute between the parties concerning the ALJ's consideration of (1) the relevant "Paragraph A criteria" (at least for Listing 12.04); (2) the relevant "Paragraph C criteria," (3) Petitioner's ability to concentrate, persist, or maintain pace (which the ALJ found to be markedly limited), or (4) Petitioner's ability to adopt or manage himself (which the ALJ found to be moderately limited).  *See generally* (AR 14-16).

**MEMORANDUM DECISION AND ORDER - 8**

Petitioner, had the ALJ properly found that his limitations in either of these areas were marked, he would have been considered disabled at step three.  *See* Pet.'s Brief, p. 8 (Dkt. 15) ("Therefore, Petitioner would only need to be markedly impaired in one other area to be considered disabled.").

The Court is satisfied, as explained to follow, that the ALJ's step three determination is supported by substantial evidence.

> a.  *Understanding, Remembering, or Applying Information*

The pertinent regulation describes the adaptive function of understanding, remembering, or applying information as:

> the abilities to learn, recall, and use information to perform work activities. Examples include:  Understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions.

20 C.F.R. § 404, Subpt. P, App. 1 § 12.00(E)(1).  The ALJ concluded that Petitioner has moderate limitations in this area, stating in relevant part:

> In understanding, remembering, or applying information, the claimant has a moderate limitation.  In the Function Report, the claimant alleged difficulty with memory.  (Ex. 7E/6).  The claimant reported that he could never go to the store without a list and had trouble handling money.  (Ex. 7E/4).  However, the claimant reported that he could follow simple spoken instructions and could follow written instructions if they were in front of him.  (Ex. 7E/6).  On December 18, 2015, the claimant was only able to recall four digits forward and backward and recall 3/3 items immediately and 1/3 after a short delay.  (Ex. 2F/3).  Michael Emery, Ph.D., noted that the claimant did much better with remote memory than with short term memory, as he could name the last four US presidents, identify five famous people, five large cities, and three current events, and spell "world" correctly forward and backward.  (Ex. 2F/3).  By January 24, 2017, Cynthia Tremblay, Ph.D., found high average intellectual functioning and average attention, psychomotor speed, language, and executive functioning.  (Ex. 6F/5).  Finally, Dr. Tremblay noted that the claimant's test results demonstrated mild cognitive weaknesses, including verbal learning and recall.  (Ex. 6F/6).  Therefore, the claimant has moderate limitation in understanding, remembering, and applying information.

**MEMORANDUM DECISION AND ORDER - 9**

(AR 14); *see also* (AR 362) (Dr. Emery concluding:  "Memory and concentration for simple material is mildly to moderately impaired, for complex moderately to markedly" and that "[u]nderstanding is no more than mildly impaired. . . .  General adaptation due to psychological factors, memory loss, depression, and interpersonal issues is moderately impaired."); (AR 420) (Dr. Tremblay concluding: "The results show mild deficits in verbal learning and recall . . . . Qualitative data from the visuoconstruction task and a list learning and memory task suggest mainly organization problems.  Though he had some difficulty with verbal memory recall, verbal memory recognition was average to above average.  All other scores across domains of language, attention, processing speed, executive functioning, and visual memory were within the average to superior range.  He demonstrated notable strengths in nonverbal/visual memory, perceptual reasoning, and fund of general factual knowledge.  The results are evident in the context of an estimated high average level of premorbid intellectual functioning with commensurate current intellectual functioning."); *id*. (when discussing etiology, Dr. Tremblay characterizing Petitioner's conditions as "mild cognitive weaknesses").

Petitioner does not challenge these findings in and of themselves, but instead cites to other areas of the record that he would contend are illustrative of marked limitations in his ability to understand, remember, or apply information.  *See generally* Pet.'s Brief, pp. 8-9 (Dkt. 15). For example, he argues that (1) James Whiteside, M.D. noted that "[h]is history is somewhat suspicious for dementia with Lewy bodies as he has REM behavior disorder, marked temporal fluctuations in cognition, gait changes, and psychosis"; (2) Dr. Tremblay indicated his list learning and memory task scores were low average; and (3) Dr. Emery characterized his memory as poor, stating that "[h]is perception of failing memory is supported by psychometrics" and "is

**MEMORANDUM DECISION AND ORDER - 10**

most compromised with new material and more so with complex than simple material." *Id*. at p. 9 (citing (AR 406, 419, 361-62)).

However, setting aside the balance of Drs. Tremblay and Emery's findings (*see supra*), nowhere does Petitioner connect these references from the record to a corresponding finding that Petitioner necessarily has something other than moderate limitations in his ability to understand, remember, or apply information. Said another way, such evidence, without more, arguably confirms what the ALJ already found – namely, that Petitioner has limitations in these areas, and that such limitations rise only to moderate levels. *See* Respt.'s Brief, pp. 6-7 (Dkt. 16); *see also infra* (ALJ disagreeing with Petitioner's interpretation of Dr. Tremblay's report during August 25, 2017 hearing: "I don't know how you read that and say that he concluded that his memory was severely impaired.") (quoting (AR 46)). The ALJ's consideration of this point at step three is therefore supported by substantial evidence and Petitioner's arguments to the contrary do not upend the ALJ's findings in these respects.[3]

<blockquote>b.    *Interacting With Others*</blockquote>

The pertinent regulation describes the adaptive function of interacting with others as:

> the abilities to relate to and work with supervisors, co-workers, and the public. Examples include: cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness.

---

[3] Petitioner also highlights that he was "let go" from a job because he was unable to learn a new computer system and worked too slow and inefficiently. *See* Pet.'s Brief, p. 9 (Dkt. 15). It is not clear, however, how these circumstances specifically implicate the at-issue Paragraph B criteria in ways that Petitioner seems to imply. Additionally, the lay testimony that Petitioner cites to as support for the extent of his limitations in these respects similarly fails to distinguish how his limitations rise beyond moderate levels. *See* Pet.'s Brief, pp. 9-10 (Dkt. 15). Regardless, the ALJ discounted these opinions for proper reasons elsewhere in his Decision. *See infra*.

**MEMORANDUM DECISION AND ORDER - 11**

20 C.F.R. § 404, Subpt. P, App. 1 § 12.00(E)(2).  The ALJ found that Petitioner has moderate

limitations in this area, stating in relevant part:

> In interacting with others, the claimant has a moderate limitation.  In the Function
> Report, the claimant alleged difficulty getting along with others.  (Ex. 7E/6).  He
> noted that he did not like being around strangers.  (Ex. 7E/6).  However, the
> claimant reported that he did fine with people whom he knew.  (Ex. 7E/5).  He also
> reported that he regularly went to club meetings.  (Ex. 7E/5).  On December 18,
> 2015, Dr. Emery found a moderately distressed mood, but also found a full range
> affect.  (Ex. 2F/2).  The claimant noted that he was currently serving as the president
> of a muzzle-loading group.  (Ex. 2F/1-2).  Finally, on February 22, 2017, James
> Whiteside, M.D., found normal mood, affect, and behavior.  (Ex. 5F/13-14).
> Accordingly, the claimant has moderate limitation in interacting with others.

(AR 14-15); *see also* (AR 360, 362) (Dr. Emery finding:  "Affect was full range with a

disarming smile at the end of sentences. . . .   General adaptation due to psychological factors,

memory loss, depression, and interpersonal issues is moderately impaired."); (AR 418) (Dr.

Tremblay reporting:  "Affect was congruent with reported mood. . . .  Overall, he was pleasant

and cooperative and formal and embedded measures of task engagement and performance

validity were within normal limits.").

As before, Petitioner does not contest these findings overall, but offers up his own (in

addition to lay) testimony as presumably better reflective of his allegedly more significant

problems in interacting with others.  *See* Pet.'s Brief, p. 10 (Dkt. 15).  He also points to Dr.

Emery's acknowledgment that his "[s]ocial function is complex"; that he "does all right with the

muzzle-loaders group, people he knows and has known for a long time gathered with a common

purpose"; and that he "has significant difficulty, to the point of marked impairment with less

structure."  *Id*. at p. 11 (citing (AR 362)) (concluding without support that "Working in

competitive employment would likely not include working with people that Petitioner knows or

has known for a long time, nor would competitive employment provide the social structure

Petitioner required to be successful.").

**MEMORANDUM DECISION AND ORDER - 12**

But, again, these isolated references establish only that Petitioner has limitations when it comes to interacting with others – exactly what the ALJ concluded and which is undisputed here. The Court is not persuaded that the record conflicts with a finding that Petitioner has only moderate limitations in interacting with others.  Whether the record can also be read to support a finding that Petitioner has marked limitations in interacting with others (and, for that matter, in understanding, remembering, or applying information (*see supra*)), is immaterial and ignores the standard of review applicable to the ALJ's findings in this setting.  *See supra*.  Rather, substantial evidence exists to support the ALJ's step-three determination that Petitioner's mental conditions do not meet or equal a listed impairment.

      2.    <u>The ALJ Did Not Err in Questioning Petitioner's Credibility</u>

As the trier-of-fact, the ALJ is in the best position to make credibility determinations and, for this reason, his determinations are entitled to great weight.  *See Anderson v. Sullivan*, 914 F.2d 1121, 1124 (9th Cir. 1990); *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities).  In evaluating a claimant's credibility, the ALJ may engage in ordinary techniques of credibility evaluation, including consideration of claimant's reputation for truthfulness and inconsistencies in claimant's testimony, or between claimant's testimony and conduct, as well as claimant's daily activities, claimant's work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains.  *See Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).  Also, the ALJ may consider location, duration, and frequency of symptoms; factors that precipitate and aggravate those symptoms; amount and side effects of medications; and treatment measures taken by claimant to alleviate those symptoms.  *See* SSR 96-7p.  In short, "[c]redibility decisions are the province of the ALJ."  *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989).  However, to

**MEMORANDUM DECISION AND ORDER - 13**

reject a claimant's testimony, the ALJ must make specific findings stating clear and convincing

reasons for doing so.  *See Holohan*, 246 F.3d at 1208 (citing *Reddick*, 157 F.3d at 722).

      Here, Petitioner alleges disabling limitations resulting from vertigo, depression, and

diabetes.  *See* (AR 229) (Petitioner stating he stopped working on June 25, 2015 because of his

conditions:  "My production lagged due to my condition and my employer resorted to letting me

go."); *see also* Pet.'s Brief, pp. 11, 14 (Dkt. 15) ("The ALJ erred when he improperly dismissed

Petitioner's allegations of pain and other symptoms as inconsistent with the medical evidence of

record. . . .  The ALJ provided no clear and convincing reasons to reject Petitioner's allegations

of poor memory, uncontrolled diabetes, vertigo, or back pain.").  For example, within his

November 9, 2015 "Function Report – Adult," Petitioner states:

- "My loss of memory is one of my worst problems, coupled with physical pain involved with lifting and bending.  I have pain in my neck, shoulders, elbow R, hands, back, knees, and feet.  Repetitive bending and lifting hurt quickly in back and arms.  I have also had dizzy spells for 2 years.  Was treated for vertigo but to no avail."  (AR 257).

- He sometimes needs special reminders to take care of personal needs and grooming, "but not often yet."  (AR 259).

- He sometimes needs help or reminders taking medicine.  *See id.*

- He doesn't shop much, and "never without a list."  (AR 260).

- Money management is "too confusing," he watches what he spends and checks with his wife.  *Id.*

- He "used to be more active in financial decisions" and is still consulted because he is "not completely stupid yet."  (AR 261).

- "Sometimes I think people are being rude or disrespectful when they aren't.  [I] like people less and less, just don't like being around strangers much."  (AR 262).

He went on to more-or-less confirm as much during the August 25, 2017 hearing, testifying in

response to questions from his attorney and the ALJ as follows:

**MEMORANDUM DECISION AND ORDER - 14**

ATT:   All right.  So, Troy, we are going to start with just some basics.  You mentioned that you worked for a very long time and they brought in some new computer programs for you to work.  Why did you have difficulty with those?

PET:   Well when they brought in the new computer program they also brought in new product codes.  Some of our old product codes would still work but some wouldn't.  The first three years I worked there I tried to memorize all the product codes and succeeded in memorizing quite a few, but I still had to go back a lot of times if I was writing a customer's order up.  And the product codes were all in place where the product was located, so on the shelves and a lot of times I would have to go back and – and look at the product code.  And then, like I said, the computer program was just different enough from our old one that it took quite awhile to figure it out.  And I still had problems.  I was never really comfortable when I had to work the counter by myself, because if I had one of the clerks up there I could ask them, you know, how do I do this?  If I had to return a product, it was – usually required that I get somebody's help.

ATT:   What – what keeps you from working?  I mean we've talked about have you applied for jobs or anything like that?  What keeps you from applying for jobs or – working?  What keeps you from doing that?

PET:   Well, when I was – before I thought we had any kind of a problem here and I had just tried to find a job after I lost that one, you know, I would apply for jobs I felt I could do.  But usually in the interview process I – I mean they didn't hire me, so maybe

. . . .

ALJ:   All right.  And did something happen at that point where you decided that you couldn't work?

PET:   There were certain things that, you know, I would look at a job listing and try to, you know, say reasonably could I do that job.  And there were some that I reasonably felt that I could not do any longer, things that I might have used to been able to do.  So I think eventually I kind of gave up on it, yes.

ALJ:   Okay.  And so just so I understand, you gave up on this because either something happened where you felt you no longer were capable of working?  Or you gave up because you were frustrated that you tried a number of spots and you weren't hired?

PET:   I believe it was more the latter – or the first, that I was not capable of doing certain jobs that I may have been capable of previously.  With my dizziness, there are certain jobs that I felt I should no longer do for safety reasons.  Most of my jobs prior to that at Silver Creek and what not required me to

**MEMORANDUM DECISION AND ORDER - 15**

climb ladders and – or to go up on shelving, and where I got dizzy I did not feel that was safe to do.

ALJ:  Okay.  I mean you have reported that currently you're aware that if you don't move your head rapidly you don't experience dizziness.  Is that true?

PET:  Yes.

ALJ:  So you are aware of how you can control that for the most –

PET:  Sometimes.  I have had instances where due to outside things, I had a wasp fly in front of my face one time and without taking time to think about it I turned my head as I swatted at him, and luckily I was where I could get down on my hands and knees before I fell.  Had I been driving or working in some other capacity, it could have been disastrous.  I sold my motorcycle so that I didn't become 100 yards of road rash.

ALJ:  Sure, understood.

PET:  So I may not be capable of doing some stuff, but I'm not stupid yet.

. . . .

ATT:  At some point, yes.  Do you do any of the shipping for the house?  Can you go out and get some groceries, drive to the grocery store and bring groceries home?

PET:  I can go to the grocery store a couple blocks away so, yes, I can.

ATT:  Do you need a list?

PET:  Oh, yes.

ATT:  Do you need to take – do you need a list to remember to take the list?

PET:  Not quite.

. . . .

ATT:  Okay.  Do you – you still have a driver's license?

PET:  I do.

ATT:  Okay.  Can you drive further than the two blocks from your home and make it back to your home?

PET:  So far.

**MEMORANDUM DECISION AND ORDER - 16**

ATT:   But can you drive all the way into Boise and make it back?

PET:   I might be able to, but I don't try that.

ATT:   And why don't you try that?

PET:   Because I don't know if I will make it back.

ATT:   Have you gotten lost before?

PET:   Yes, I have.

ATT:   Okay.  Do – and how did you make it back?  Did you have to call somebody or –

PET:   The thought occurred to me, but I also – I can recognize north, south, east, and west and I just kept driving east until I found a place that was familiar.

ATT:   Okay.

PET:   I knew where I was again and I could get home from there.

ATT:   How often do you go out to visit friends or family?

PET:   Rarely.

. . . .

ATT:   How far can you walk before your feet start to hurt that you need to stop and take a break?

PET:   I can usually walk about a half a mile down the bike path and then I will stop, rest for little bit.

ATT:   Then you can –

PET:   And part of that is if I go much farther than that I get chest pain, too, so –

ATT:   Okay.  How about your back pain, how long can you comfortably sit before your back makes you have to get up and move around?

PET:   Maybe an hour or two.

ATT:   Okay.  And how well do you sleep at night?

PET:   Poorly.

**MEMORANDUM DECISION AND ORDER - 17**

ATT:   And why do you sleep poorly?

PET:   Usually because my back pain or my arms will fall asleep and that wakes me up a lot.

ATT:   Okay.

PET:   And sometimes I just – I have insomnia.  I can't get to sleep or stay asleep.

ATT:   And –

PET:   And my back also comes into play when I'm walking.  It depends on how fast I walk and what not.

. . . .

ATT:   Okay.  There is also mention of anger and agitation.  What makes you angry?  what, like, sets you off?

PET:   There's various things.

ATT:   Name one.

PET:   People, I have – since I was young I always had vowed that I would not work with the public just because I didn't like people too well then even. But the longer I have worked, most all of my jobs have been with the public and it's pretty well reinforced what I thought when I was a kid.  I don't like people that well.

(AR 47-56).

The ALJ, however, concluded that, while Petitioner's medically-determinable impairments could reasonably be expected to cause his alleged symptoms, his "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (AR 19).  As described to follow, the ALJ's justification in this regard amounts to clear and convincing reasons for questioning Petitioner's credibility.

First, in challenging the ALJ's consideration of his credibility, Petitioner points to those instances in the record where, in fact, his symptomology is confirmed, before reframing the issue

**MEMORANDUM DECISION AND ORDER - 18**

as the ALJ's failure to explain why Petitioner's allegations surrounding those same symptoms are not credible.  *See* Pet.'s Brief, p. 12 (Dkt. 15) ("However, following those observations, the ALJ summarized the medical evidence, never explaining why Petitioner's allegations of back pain, memory loss, dizzy spells, and diabetes complications were not credible . . . .").  But the ALJ did not reject Petitioner's allegations that he suffers from certain impairments which impact his ability to work; to be sure, the ALJ concluded that Petitioner suffers from vertigo, diabetes, obesity, depression, and cognitive disorder, and that such impairments are severe.  *See supra* (citing (AR 12)).  Rather, the ALJ questioned the *extent* to which these recognized impairments and related symptoms prevented Petitioner from working altogether.  This distinction was highlighted in the following exchange between the ALJ and Petitioner's attorney during the August 25, 2017 hearing (after Petitioner's attorney recounted Petitioner's miscellaneous impairments as identified in the record):

> ALJ:   Right, what you did was identify a whole list of impairments which –
>
> ATT:   Yes.
>
> ALJ:   -- I'm just convinced you're not going to really suggest to me that all of those result in severe limitations in his capacities.  I mean, if so, obviously you are free to make that argument, but obviously just because somebody's been diagnosed with something, as you well know –
>
> ATT:   Right.
>
> ALJ:   -- doesn't mean that that keeps them from being able to do a particular function or may limit them in their capacity to do a function.  But a limitation certainly isn't – doesn't create a circumstance where the person can't do anything at all.  So do you wish to refine that list for my benefit as far as what might be a severe impairment?  Or are you really suggesting those all have significant effects upon his capabilities?
>
> ATT:   I would say that they all have significant effects.  Memory, tremors in his hands, Parkinsonian type syndrome, his diabetes that is affecting his feet, neuropathy, vertigo is certainly a large issue.  And his cardiac, the cardiac is so far controlled with medications.

**MEMORANDUM DECISION AND ORDER - 19**

ALJ:   Right.

ATT:   So that one might not be quite as significant as the others.

ALJ:   Okay.  Well I was struck that, for example, if we just want to look at one of those, the memory issue.  In your review of Dr. Tremblay where you said that he found severe memory issues –

ATT:   Dr. Emery in 2F?

ALJ:   No, I'm sorry, Dr. Tremblay.

ATT:   Tremblay.

ALJ:   Tremblay, is what I meant to say if I didn't, in F6 is not the way I read [her] report at all.

ATT:   Which one is she?  She's –

ALJ:   You know, for example, 6F at 6, though he had some difficulty with verbal memory recall, verbal memory recognition was average to above average. He noted – he demonstrated notable strengths in non-verbal visual memory, perceptual reasoning and fund of general knowledge.  I don't know how you read that and say that he concluded that his memory was severely impaired.

(AR 45-46).  Even so, the ALJ specifically accounted for Petitioner's limitations during the fourth step of the sequential process (RFC analysis).  *See* (AR 16) (Petitioner has RFC to perform medium work, except that Petitioner "can occasionally balance and climb ramps and stairs, but can never climb ropes, ladders, or scaffolds . . . ., can never work at unprotected heights or around moving mechanical parts . . . ., is limited to performing simple, routine, and repetitive tasks and following simple work related instructions . . . ., is limited to simple work related decisions . . ., can occasionally interact with the public."); *see also* (AR 20) (recounting Petitioner's RFC in light of balance of medical record).  Therefore, to the extent Petitioner's arguments insist on the existence of certain limiting impairments or symptoms, they miss the point because the provided limitations in the RFC accommodate his symptoms.  The question at

**MEMORANDUM DECISION AND ORDER - 20**

this stage is not whether such limitations/symptoms exist, but whether Petitioner is able to work even with such limitations.

Second, concerning the post-onset date medical evidence, the ALJ found that it "is not consistent with the allegations about the debilitating nature of the claimant's impairments." (AR 19). In particular, the ALJ noted Petitioner's vertigo allegations, but then contrasted them with Dr. Whiteside's normal neurological findings. *See* (AR 19) (citing (AR 411-12)). Similarly, the ALJ acknowledged Petitioner's diabetes, before pointing out that Scott A. Shappard, D.O., found (1) a good range of motion in all extremities without clubbing, cyanosis, or edema, normal pulses, and no focal sensory or motor deficits, and (2) improving blood sugar levels and compliance with diet and medications. *See* (AR 19) (citing (AR 369, 429)). Finally, as discussed above, the ALJ incorporated the findings from Drs. Emery and Tremblay concerning Petitioner's mental impairments. *See supra*. Considered together and tested against one another for consistency and supportability, these opinions reveal a disconnect between Petitioner's claimed inability to work and the medical record. *See* (AR 19) (ALJ concluding that "the medical evidence suggests that the claimant's impairments are not as debilitating as alleged.").

Third, the ALJ concluded that Petitioner's daily activities were inconsistent with his allegations of disabling symptoms and limitations, pointing out:

> Moreover, the claimant's activities of daily living are greater than what one would expect of a fully disabled individual. In the Function Report, the claimant reported that he could care for his personal needs, prepare simple meals, and perform household chores, such as vacuuming, doing the dishes, and mowing the yard. (Ex. 7E/3). The claimant reported that he could drive around town. (Ex. 7E/4). Moreover, on December 18, 2015, the claimant reported that he cared for his pre-school aged grandson while his wife and son were at work. (Ex. 2F/1). The claimant reported that he made snacks for the boy and occasionally took him to the park. (Ex. 2F/1). The claimant noted that he was currently serving as the president of a muzzle-loading group. (Ex. 2F/1-2). By February 4, 2016, the claimant reported that he was working in his shop. (Ex. 3F/1). Finally, the claimant worked after the alleged onset date, including $3,601 in the second quarter of 2015 and $741 in the third quarter of 2015, suggesting additional activities of daily living.

**MEMORANDUM DECISION AND ORDER - 21**

> (Ex. 5D).  Therefore, the claimant's broad range of activities of daily living suggest
> that the claimant's impairments are not as debilitating as alleged.

(AR 19-20).  In other words, the ALJ appropriately did not reject Petitioner's complaints that he

suffers from certain impairments; rather, considering and discussing his daily activities

(including those reflected in the record), his focus was on Petitioner's claim that he cannot work

*because* those impairments allegedly limit her ability to work.  *See, e.g.*, *Madrid v. Colvin*, 2016

WL 1161978, at *10, n.8 (N.D. Cal. 2016) ("The Ninth Circuit has held that 'the adjudicator may

not discredit a claimant's testimony of pain and deny disability benefits solely because the

degree of pain alleged by the claimant is not supported by objective medical evidence.'  As

discussed herein, the ALJ did not reject Plaintiff's allegations that she suffers hand pain, but

rather evaluated record evidence regarding Plaintiff's alleged diminished dexterity.") (quoting

*Bunnell v. Sullivan*, 947 F.2d 341, 346-47 (9th Cir. 1991)).

Together, these reasons offer clear and convincing explanations as to why the ALJ did

not find Petitioner's testimony entirely credible.  It bears repeating here that the Court is not

deciding that Petitioner is not disabled under the applicable rules and regulations, or that

Petitioner does not suffer from chronic pain.  Here also, Petitioner identifies (or at least suggests

the existence of) conflicting evidence in support of his position.  The important distinction under

the review given by this Court is that even though conflicting evidence may not have been given

the weight Petitioner would have preferred, the ALJ's decision to doubt Petitioner's credibility in

denying disability benefits contains clear and convincing reasons for doing so.  As required by

controlling law, the ALJ will not be second-guessed as to such conclusions, on the record here

and the justifications provided.  *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190 (9th

Cir. 2004) ("[T]he Commissioner's findings are upheld if supported by inferences reasonably

drawn from the record, and if evidence exists to support more than one rational interpretation, we

**MEMORANDUM DECISION AND ORDER - 22**

must defer to the Commissioner's decision.") (internal citations omitted).  Therefore, the Court

will not substitute its judgment when the evidence in the record can support the ALJ's findings.

     3.    <u>The ALJ Did Not Err in Weighing Third-Party Testimony</u>

Petitioner contends that the ALJ erred by improperly dismissing third-party opinions.

*See* Pet.'s Brief, pp. 14-16 (Dkt. 15).  He relies upon a now outdated regulation providing that

"[d]isregard of the testimony of friends and family members violates 20 C.F.R. § 404.1513(e)(2)

(1991)."  *Id*. at p. 14.  He argues that the ALJ improperly disregarded his wife's opinions.

The revised, now applicable, standard is not whether the ALJ disregarded such testimony.

Rather, the ALJ must only "consider" such opinions.  20 C.F.R. § 404.1529(c)(3).  Even so, the

distinction may be a narrow one, as "competent lay witness testimony cannot be disregarded

without comment . . . [and] in order to discount competent lay witness testimony, the ALJ must

give reasons that are germane to each witness."  *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir.

2012) (internal citations and quotation marks omitted).  But the ALJ need not "discuss every

witness's testimony on an individualized, witness-by-witness basis; rather, if germane reasons

are described for rejecting testimony by one witness, the ALJ need only point to those reasons

when rejecting similar testimony by a different witness."  *Id*.

Here, the ALJ specifically discussed the opinions of Petitioner's wife (as well as

Petitioner's son and previous manager) – giving "some weight" to each of their statements.  *See*

(AR 21-22).  He noted:

> Theresa Upshaw, the claimant's wife, testified at the hearing and provided a Third
> Party Function Report that includes statements regarding the claimant's activities
> of daily living and alleged functional limitations, which are generally consistent
> with statements made by the claimant.  (Ex. 5E).  David Upshaw, the claimant's
> son, and Chad McAllister, the claimant['s] previous manager, also provided
> statements regarding the claimant's functional limitations.  (Ex. 15E and 16E).
> Because Social Security regulations consider Mrs. Upshaw, Mr. Upshaw, and Mr.
> McAllister to be non-medical sources, I have considered their statements as those
> of "other sources."  (20 CFR 404.1513(a) and (d), 20 CFR 416.913(a) and (d)).  I

**MEMORANDUM DECISION AND ORDER - 23**

give some weight to Mrs. Upshaw, Mr. Upshaw, and Mr. McAllister's statements, although believe they are not fully consistent with the objective medical evidence and medical opinions of record.   (Ex. 6F).   Furthermore, Mrs. Upshaw, Mr. Upshaw, and Mr. McAllister do not have the medical training necessary to make exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms or the frequency or intensity of unusual moods or mannerisms. More importantly, by virtue of their relationships with the claimant, I cannot consider Mrs. Upshaw, Mr. Upshaw, and Mr. McAllister to be fully disinterested third party witnesses whose statements would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges.  Therefore, I give some weight to Mrs. Upshaw, Mr. Upshaw, and Mr. McAllister's statements.

*Id*.

Petitioner frames this as boilerplate, inferring that the ALJ did not fully consider his wife's statements.  *See* Pet.'s Brief, p. 15 (Dkt. 15).  The Court is not persuaded.  Again, it is clear that Petitioner has a number of impairments that impact his ability to work – the medical record supports this, Petitioner's testimony supports this, and Petitioner's wife's testimony supports this, all of which, in combination, is a sensible explanation for the ALJ's ultimate finding that certain of Petitioner's impairments are severe and that those impairments involve work-related limitations.  *See supra*.  But when the medical record can be read as not supporting a completely disabling condition, then contrary testimony need not be accepted in toto.  *See Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (inconsistency with medical evidence is germane reason for discrediting lay witness testimony).  This explains the ALJ's treatment of both Petitioner and his wife's testimony.  Thus, as to such opinions, Petitioner does not show either that they were not considered or lacked germane reasons for granting them "some weight."

4.    The ALJ Did Not Err in Assigning Petitioner's RFC

Petitioner argues that the ALJ's step four and step five findings did not "include all of Petitioner's functional limitations in the RFC."  Pet.'s Brief, p. 16 (Dkt. 15).  Petitioner points out the lifting/carrying and walking/standing restrictions for medium work before arguing that the constellation of non-severe limitations (foot pain, hand tremor, and cardiac disease) render

**MEMORANDUM DECISION AND ORDER - 24**

him disabled. *See id.* at p. 17 ("Although these limitations, by themselves, may not significantly limit Petitioner's ability to do work-related activity, when added together and added to the severe impairments, they were the proverbial straw that broke the camel's back.").

Highlighting the fact of the medical record's references to various impairments and limitations (and, likewise, Petitioner's similar testimony) does not establish that the RFC assigned to Petitioner is lacking. Any connection is lacking in this record to "why" in light of his impairments the RFC fails to capture the extent of his limitations[4]. Instead, the ALJ attempted to fold into Petitioner's RFC all the credible limitations, stating:

> Hence, while the record shows that the claimant has some issues relating to his physical and mental impairments, it contains no credible evidence showing that the claimant's impairments were of the type or nature that would have precluded all employment by the claimant during the relevant period and thus require findings of disability. As such, I have limited the claimant to the medium exertional level with additional postural, manipulative, and environmental restrictions due to his physical impairments. Turning to the claimant's mental impairments, the record shows some evidence of difficulty with the ability to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage himself. (Ex. 2F; 5F; and 6F). Accordingly, the claimant has been limited to simple, routine, or repetitive tasks and his contact with the general public has been limited to only occasional interaction.
>
> . . . .
>
> In summation, I find the above residual functional capacity assessment is supported by the record when considered as a whole. I have considered the reports of the State agency medical and psychological consultants as well as other treating, examining, and non-examining medical sources. I have also considered the medical records, the claimant's previous work, the claimant's activities of daily living, and the hearing testimony. I find that the claimant's limitations are not fully disabling and that the claimant retains the capacity to perform work activities at the medium exertional level with the additional postural, manipulative, environmental, and mental restrictions set forth above.

---

[4] To the extent that Petitioner's arguments are also premised upon the ALJ's credibility determination and consideration of third-party testimony (*see* Pet.'s Brief, pp. 18-19 (Dkt. 15)), they are misplaced, as the Court finds that the ALJ did not err in either respect. *See supra*.

**MEMORANDUM DECISION AND ORDER - 25**

(AR 20, 22).  Because the RFC finding is supported by substantial evidence, including the AJL's

reasonable analysis of Petitioner's testimony, Petitioner's wife's testimony, and the medical

opinion evidence, the ALJ did not err in assigning Petitioner's RFC.

## IV.  <u>CONCLUSION</u>

The ALJ, as fact-finder, must weigh the evidence, draw inferences from facts, and

determine credibility.  *Allen*, 749 F.2d at 579; *Vincent ex. rel. Vincent*, 739 F.2d at 1394; *Sample*,

694 F.2d at 642.  If the evidence is susceptible to more than one rational interpretation, one of

which is the ALJ's, the Court may not substitute its interpretation for that of the ALJ.  *Key*, 754

F.2d at 1549.  The ALJ has provided reasonable and rational support for his well-formed

conclusions, even if such evidence is susceptible to a different interpretation.  Accordingly, the

ALJ's decisions as to Petitioner's disability claim were based on proper legal standards and

supported by substantial evidence.  Therefore, the Commissioner's decision that Petitioner is not

disabled within the meaning of the Social Security Act is supported by substantial evidence in

the record and is based upon an application of proper legal standards.

The Commissioner's decision is affirmed.

## V.  <u>ORDER</u>

Based on the foregoing, the decision of the Commissioner is AFFIRMED and this action

is DISMISSED in its entirety, with prejudice.

DATED: May 19, 2020

Ronald E. Bush
Chief U.S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 26**